**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**BMO HARRIS BANK, N.A.**                                                    **PLAINTIFF**

**v.**                                          **Case No. 4:21-cv-01174-KGB**

**MID WEST STEEL TRANSPORT LLC**                                      **DEFENDANTS**

<u>**ORDER**</u>

Before the Court is plaintiff BMO Harris Bank N.A.'s ("BMO") motion for default judgment against defendant Mid West Steel Transport LLC ("Mid West") and Joseph Brodsky (Dkt. No. 8).  For the following reasons, the Court grants BMO's motion for default but declines to enter judgment at this time, subject to further briefing from BMO or a hearing on damages (*Id*.).

**I.       Factual And Procedural Background**

On December 2, 2021, BMO filed this lawsuit against Mid West and Mr. Brodsky alleging that defendants are in default under certain loan and security agreements ("Agreements") and guaranties for failure to pay the agreed to amounts and seeking breach of contract damages (Dkt. No. 1).  According to the record currently before the Court, Mid West and Mr. Brodsky were served through an agent on February 5, 2022 (Dkt. No. 5-1).  Defendants, to date, have not filed an answer or responsive pleading as required by the Federal Rules of Civil Procedure, and the Clerk entered a Clerk's default against Mid West and Mr. Brodsky (Dkt. No. 7).

Under the terms and conditions of the Agreements, Mid West and Mr. Brodsky's failure to make a payment when due is considered an event of default (Dkt. No. 8-2, ¶¶ 10; 16). According to BMO, under Agreement 1 Mid West was due to make minimum monthly payments of $3,019.07 beginning on June 8, 2019, for a term of 48 months (*Id*., ¶¶ 8-9).  Under Agreement 2, Mid West was due to make minimum monthly payments of $866.90 beginning on July 1, 2019,

for a term of 60 months (*Id*. ¶¶ 8-9, 14-15).  Under the remedies of default in the Agreements, BMO may declare the indebtedness due and payable (*Id*., ¶ 11).  According to the records of BMO, Mid West defaulted under the terms of Agreement 1 by failing to make minimum monthly payments on or about August 8, 2021 (*Id*., ¶ 12).  According to the records of BMO, Mid West defaulted under the terms of Agreement 2 on or about August 1, 2021 (*Id*., ¶ 18).  Mr. Brodsky executed guaranties agreeing to the prompt payment and performance of all obligations, liabilities, and undertakings of Mid West to BMO (*Id*., ¶ 20).  Defendants have failed to pay BMO $89,686.79 in overdue payments, late charges, and liquidated damages in connection with the Agreements (*Id*., ¶ 22, at 21-22).

## II.    Default Judgment

BMO moves for entry of default judgment under Rule 55(b)(2) of the Federal Rules of Civil Procedure.  Federal Rule of Civil Procedure 55 contemplates a two-step process for the entry of default judgments.  *Fraserside IP L.L.C. v. Youngtek Solutions Ltd.*, 796 F. Supp. 2d 946, 951 (N.D. Iowa 2011) (citation and internal quotation marks omitted).  First, pursuant to Rule 55(a), the party seeking a default judgment must have the Clerk of Court enter the default by submitting the required proof that the opposing party has failed to plead or otherwise defend.  *Id.*  Second, pursuant to Rule 55(b), the moving party may seek entry of judgment on the default under either subdivision (b)(1) or (b)(2) of the rule.  *Id.*  Entry of default under Rule 55(a) must precede a grant of default judgment under Rule 55(b).  *Id.*

Rule 55(b)(1) states that, "[i]f the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk – on the plaintiff's request, with an affidavit showing the amount due – must enter judgment for that amount and costs against a defendant who has been

defaulted for not appearing and who is neither a minor nor an incompetent person." Fed. R. Civ. P. 55(b)(1).

"Entry of a default judgment . . . [is] committed to the sound discretion of the district court. Default judgments, however, are not favored by the law." *United States v. Harre*, 983 F.2d 128, 130 (8th Cir. 1993). Once a defendant is in default, the factual allegations of the complaint, "except those relating to the amount of damages, will be taken as true." 10A Charles A. Wright, *et al.*, *Federal Practice and Procedure* § 2688.1 (4th ed. 2018) (West) (citations omitted). However, the court must ensure that the "unchallenged facts constitute a legitimate cause of action" prior to entering final judgment. *See Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010) (quoting 10A Charles A. Wright, *et al.*, *Federal Practice and Procedure* § 2688 (3d ed.)).

> In determining whether to enter default judgment, the Court may consider:
>
> the amount of money potentially involved; whether material issues of fact or issues of substantial public importance are at issue; whether the default is largely technical; whether plaintiff has been substantially prejudiced by the delay involved; and whether the grounds for default are clearly established or are in doubt. Furthermore, the court may consider how harsh an effect a default judgment might have; or whether the default was caused by a good-faith mistake or by excusable or inexcusable neglect on the part of the defendant.

10A Charles A. Wright, *et al.*, *Federal Practice & Procedure*, § 2685 (4th ed. 2018) (West) (citations omitted) (collecting cases). "Default judgment for failure to defend is appropriate when the party's conduct includes willful violations of court rules, contumacious conduct, or intentional delays. On the other hand, default judgment is not an appropriate sanction for a marginal failure to comply with time requirements." *Ackra Direct Mktg. Corp. v. Fingerhut Corp.*, 86 F.3d 852, 856 (8th Cir. 1996) (internal citations and quotation marks omitted).

Based on the above factors and case law, the Court determines that default is appropriate and grants BMO's motion for default. However, the Court declines to enter judgment at this time

on the default, subject to further briefing from BMO or a hearing on damages for the reasons explained in this Order.

As of August 8, 2021, for both Agreements, Mid West had failed to pay the amounts due and was in default. Mr. Brodsky, as Mid West's guarantor, has also failed to pay the amounts due under the Agreements. Mid West and Mr. Brodsky have both failed to appear in this action, defend against BMO's allegations, or otherwise respond to the pending motion. The Court has reviewed the factual allegations of the complaint and the language of the exhibits attached to the complaint (Dkt. No. 1). These allegations, taken as true, entitle BMO to the relief it seeks with respect to default. However, the Court is unable to enter judgment for a sum certain as to all categories of relief to which BMO is entitled. Therefore, consistent with the terms of this Order, the Court requests further briefing from BMO or a hearing on damages on these issues.

### III.    Conflict Of Laws

The Court will now address what law governs the Agreements. Under the Agreements, the parties agreed that the Agreement would be subject to the laws of the State of Illinois (Dkt. No. 8-2, at 9, ¶ 7.6; 8-2 at 15, ¶ 7.6). This is a diversity action for breach of contract (Dkt. No. 1). In determining a choice-of-law issue in a diversity action, a federal court generally looks to the choice-of-law principles of the forum state. *Simpson v. Liberty Mut. Ins. Co.,* 28 F.3d 763, 764 (8th Cir. 1994). Thus, Arkansas' choice of law principles govern what state's substantive law applies.[1]

---

[1] The Court acknowledges that BMO is a national banking association under the National Bank Act, 12 U.S.C. § 37 (1988). Its charter address and principal place of business are not in Arkansas. Regardless of whether applying Arkansas' choice of law principles would lead to application of Illinois or Arkansas law, the interest rate which a national banking association with no charter address or principal place of business in Arkansas may charge is governed by the National Bank Act, 12 U.S.C. § 85 (1988), and is the rate allowed by the laws where the national bank is "located." *See* 12 U.S.C. § 22; *Marquette Nat'l Bank of Mpls. v. First Omaha Serv. Corp.,*

Arkansas courts will enforce a contractual choice of law provision, provided that the law selected is reasonably related to the contract at issue and does not violate a fundamental public policy of the forum state. *Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.,* 926 F. Supp. 835, 841 (E.D. Ark. 1996) (collecting cases), *aff'd,* 112 F.3d 513 (8th Cir. 1997). Absent an effective contractual choice-of-law provision, Arkansas courts generally apply the "most significant relationship" test to breach of contract claims. *Fuller v. Hartford Life Ins. Co.,* 281 F.3d 704, 707 (8th Cir. 2002); *Scottsdale Ins. Co. v. Morrowland Valley Co.,* 411 S.W.3d 184, 189 (Ark. 2012). At least one court in this district has applied the most significant relationship test where there were conflicting choice of law provisions. *See Coorstek, Inc. v. Elec. Melting Servs. Co.,* Case No. 4:06-cv-1726 JMM, 2008 WL 160620, at *3 (E.D. Ark. Jan. 15, 2008). The Arkansas Supreme Court has found the following factors relevant to determine the state with the most significant relationship: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Crisler v. Unum Ins. Co. of America*, 233 S.W.3d 658, 660 (Ark. 2006) (citing Restatement (Second) Conflict of Laws § 188).

In *Britelink, Inc. v. TeleCorp PCS, Inc.*, a court in this district held that a contractual choice of law provision that selected Virginia law was unenforceable because applying Virginia law would violate a fundamental public policy of the forum state, even though Virginia law was reasonably related to the contract at issue. Case No. 3:03-cv-00207 GTE, 2004 WL 5509416, at *3-4 (E.D. Ark. May 6, 2004). The court looked at a variety of issues to determine whether the

---

439 U.S. 299 (1978) (examining these issues); *Wiseman v. State Bank and Trust, N.A.*, 854 S.W.2d 725 (Ark. 1993) (same). For these reasons, the Court will engage in the Arkansas choice of law analysis with respect to this dispute.

state of Virginia was reasonably related, including the location of the negotiations, where the contract was executed, and where contractual obligations were performed. *Id.*, at *4-5. The court determined that Virginia was reasonably related to the contract because defendant's headquarters were in Virginia for the life of the contract, plaintiff returned the executed contract to Virginia, and the contract termination letter originated in Virginia. *Id.*, at *5.

For the second factor, the *Britelink* court first determined that Arkansas had the most significant relationship to the contract at issue, examining the types of contacts outlined in Restatement (Second) Conflicts of Law § 188. *Id.*, at *6-7. The court then compared the relevant franchise practice statutes from Virginia and Arkansas and found that Virginia law displaced the fundamental public policy concerns of the Arkansas law. *Id.*, at *8. The court reasoned that "[a]ppling Virginia law, rather than Arkansas law, would result in a substantial loss of protection provided by [Arkansas law] for Arkansas franchisees." *Id.*, at *7.

According to the Agreements between BMO and Mid West, the parties agreed that "the transactions contemplated by this Agreement shall be deemed approved and entered into within the state of Illinois and all credit or other financial accommodations extended by Lender under this Agreement shall be deemed extended from and subject to the laws of the State of Illinois (without regard to the conflicts of law principles of such State) regardless of the location of Debtor or any of the Equipment." (Dkt. No. 8-2, at 9, ¶ 7.6; Dkt. No. 8-2, at 15, ¶ 7.6). Under the Agreements, Mid West agreed that "upon acceleration of the above indebtedness" at an interest rate on all sums of 1.5% per month if not prohibited by law, "otherwise at the highest rate [Mid West] can legally obligate itself to pay or [BMO] can legally collect under applicable law." (Dkt. No. 8-2, at 8, ¶ 5.3; Dkt. No. 8-2, at 14, ¶ 5.3).

The Court will now determine: (1) if the law selected by the parties in their Agreements is reasonably related to the Agreements at issue and (2) whether that choice of law violates a fundamental public policy of the forum state.

### A.    Reasonably Related

The Court will first determine if Illinois law is reasonably related to the Agreements at issue. According to the complaint, Mid West is a limited liability company organized under the laws of the state of Arkansas, with its principal place of business in Arkansas (Dkt. No. 1, ¶ 2). Mr. Bordsky is a resident of Arkansas and was Mid West's sole member (Dkt. No. 1, ¶¶ 2-3). According to the Agreements, BMO is a national banking association with its principal place of business in Chicago, Illinois (Dkt. No. 1, ¶ 1).

Based on the record before the Court, the Court determines there is a connection between the state of Illinois because of the governing law provision in the Agreements and Chicago, Illinois, being BMO's principal place of business.

### B.    Violation Of Fundamental Public Policy

The Court will now determine if there would be a violation of a fundamental public policy of Arkansas if the Court applied Illinois law. BMO asserts that Mid West and Mr. Brodsky are obligated to pay interest on all unpaid amounts at the rate of 18% per year (Dkt. No. 8-2, at 21-22). Under Arkansas law, the maximum rate of interest on contracts "shall not exceed seventeen percent (17%) per annum." Ark. Const. amend. 89, § 3; *see also In re* Veg Liquidation, Inc., 516 B.R. 545, 553 (Bankr. W.D. Ark. 2014) (discussing Ark. Const. amend. 89, §§ 3, 6). "All contracts under [Ark. Const. amend. 89, § 3] having a rate of interest in excess of the maximum lawful rate shall be void as to principal and interest . . . ." Ark. Const. amend. 89, § 6.

Applying Illinois law, rather than Arkansas law, may result in Mid West and Mr. Brodsky paying a higher maximum interest rate on the remainder of the loan amount than allowed by Arkansas law.  Even though the notes of decisions on relevant amendments to the Arkansas State Constitution are sparse, the language of Amendment 89, § 6, explicitly states that any contract with an interest rate higher than 17% is void as to principal and interest.

The Court finds persuasive the language of Amendment 89, § 6, which enforces the maximum interest rate requirement.  Based on the language of the Amendment, Arkansas has an interest in protecting Arkansas debtors from loans with high maximum interest rates, such as the maximum interest rates in the Agreements.  For these reasons, the Court finds that Amendment 89 reflects a fundamental public policy which, under the facts and circumstances of this case, may not be displaced by Illinois law.  As a result, the Court determines that, by applying Arkansas' choice of law principles, Arkansas law applies.

C.    **Arkansas Usury Law**

If the interest rate in the Agreements is higher than 17%, under Arkansas law, the Agreements are void as to principal and interest.  Here, the Acceleration Interest provision in the Agreements states specifically that the interest rate is the highest that Mid West can legally obligate itself to pay (Dkt. No. 8-2, at 8, ¶ 5.3; Dkt. No. 8-2, at 14, ¶ 5.3).  For the following reasons, the Court determines that this provision, when read in conjunction with other language in the Agreements and Guaranty, spares the contract under Arkansas law.  The Court will construe the Acceleration Interest provision as requiring an interest rate of 17% or the highest that Mid West can legally obligate itself to pay under Arkansas law.

Under Arkansas law:

Because the "penalty for a usurious transaction is indeed heavy," the plaintiff has the burden of proving by clear and convincing evidence that the lender possessed

the intent to commit usury. . . .  Usury will not be presumed, imputed, or inferred where an opposite result can be fairly and reasonably reached. . . .  The intent that is required, however, is not an intent to violate the law, but merely the intent to charge a rate of interest that proves to be usurious. . . .  In ascertaining intent, the fact-finder must look beyond the four corners of the challenged agreement "to determine, considering all of the attendant facts and circumstances, if the contract is usurious in effect."

*Hickman v. Courtney*, 203 S.W.3d 632, 636 (Ark. 2005) (internal citations omitted).

In *Ryder Truck Rental, Inc. v. Kramer*, 563 S.W.2d 451 (Ark. 1978), the lender sued the guarantor for payment after the borrower's default; the guarantor defended against the suit arguing the principal obligation was usurious and therefore void.  The Arkansas Supreme Court examined the lender's argument that "provisions of the note which state[d] that [the guarantor] guarantee[d] payment of the note with 'interest at the highest rate permitted by law' support[ed] its position" that the intent of the lender was not to impose an illegal rate of interest in the principal obligation. *Id.* at 454.  Under the facts of *Kramer*, the court rejected the lender's argument, stating:

Nor are we persuaded or convinced that [the guarantor] is precluded from asserting usury on the theory that there exists a disclaimer in that the guarantee stated the [guarantor] guarantees payment of the note with "interest at the highest rate permitted by law."  It must be remembered that the quoted provision appears only in connection with the guaranty agreement and does not appear in the principal obligation between the maker and [lender].  As asserted by the [guarantor], the principal obligation having been rendered illegal and void [due to a usurious principal obligation], there is nothing for the [guarantor] to guarantee.

*Kramer*, 563 S.W.2d at 454-55.

BMO is suing Mid West, the borrower, and Mr. Brodsky, the guarantor, on the Agreements.  The 2017 Agreement charges "an interest rate of 13.75% per annum based on a 360-day year of twelve 30-day months. . . ." (Dkt. No. 8-2, at 6).  The 2020 Agreement charges "an interest rate of 11.41% per annum, based on a 360-day year of twelve 30-day months. . . ." (Dkt. No. 8-2, at 12).  Further, the underlying Agreement includes a provision entitled "Maximum Interest Rate," in which the parties contractually agreed it is their intent to comply with applicable

9

usury laws, that in no event should the interest amount be permitted to exceed the maximum interest rate allowable under applicable law, and that even if the amounts due are accelerated thereby increasing the interest rate, as remedy for any alleged violation:

> (a) the Interest Amount hereunder shall be limited to the maximum amount lawfully permitted, and (b) any excess Interest Amount that may have been received shall, at Lender's option, either be credited to the unpaid principal balance of the loan as prepayment of principal, without any prepayment fee, or refunded to Debtor, and the effective interest rate (taking into account all Interest Amounts) shall automatically be reduced to the maximum lawful rate allowed under applicable law as of now or hereafter construed by a court of competent jurisdiction.

(Dkt. No. 8-2 at 7, ¶ 3.7; at 13, ¶ 3.6).  The terms of the Guaranty do not alter these terms of the underlying Agreements (Dkt. No. 8-2, at 18-19).  There is no indication that, to date, Mid West or Mr. Brodsky have been required to pay usurious interest rates.

These facts set this case apart from *Kramer*.  The language at issue appears in the parties' underlying Agreements, not just the Guaranty.  As a result, the Court can fairly and reasonably reach the conclusion that the parties' intended from the outset that the underlying Agreements not be usurious, and the Court can reach that result by enforcing as written the contractual language of the underlying Agreements.  The Court concludes that Mid West and Mr. Brodsky are obligated to pay interest on all unpaid amounts at the rate of 17% per year.

## IV.   Damages

Because the Court enters default, the Court now must determine the amount of damages for which Mid West and Mr. Brodsky are liable.  Once a defendant is in default, the factual allegations of the complaint, "except those relating to the amount of damages, will be taken as true."  10A Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 2688.1 (4th ed. 2018) (West) (citations omitted).  Under Rule 55(b)(2), the Court may hold an evidentiary hearing to determine damages, but a hearing is not required if the amount is ascertainable from definite

figures, facts, and evidence provided by plaintiffs. *Holman v. National Postal Mail Handlers Union,* 117 F.3d 1422 (8th Cir. 1997) (per curiam); *Taylor v. City of Ballwin,* 859 F.2d 1330, 1332-33 (8th Cir. 1988); Fed. R. Civ. P. 55(b)(2) ("The court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to . . . determine the amount of damages.").

Pursuant to Rule 55(b), to establish damages, BMO has produced the certification of Bryan J. Schrepel, a litigation specialist for BMO, attached to BMO's motion for default judgment (Dkt. No. 8-2, Schrepel Aff.). Mr. Schrepel has personal knowledge of the records maintained by BMO with respect to the Agreements with Mid West and Mr. Brodsky (*Id.*, ¶ 2). According to Mr. Schrepel, defendants have failed to pay BMO $89,686.79 in overdue payments, late charges, and liquidated damages in connection with the Agreements (*Id.*, ¶ 22). Mr. Schrepel provides with his affidavit default judgment damages calculations that rely on interest accruing at a rate of 18% per annum on the amounts due and owing under the Agreements (*Id.*, at 21-22). Because the interest rate of 18% is inconsistent with the 17% interest rate which the Court determined is appropriate in this case, the Court is unable to enter judgment for a sum certain as to all categories of relief to which BMO is entitled. Therefore, consistent with the terms of this Order, the Court requests further briefing from BMO or a hearing on damages on these issues.

### V.     Attorneys' Fees And Costs

BMO also requests attorneys' fees and costs in its motion for default judgment (Dkt. No. 8-3, at 4). BMO does not provide the Court with any documentation supporting its request for request for attorneys' fees and costs. Therefore, the Court requests further briefing from BMO or a hearing on BMO's request for attorneys' fees and costs.

## VI.     Conclusion

For these reasons, the Court enters default against Mid West Steel Transport, LLC and Joseph Brodsky.  The Court, consistent with the terms of this Order, requests further briefing from BMO or a hearing on damages before entering a judgment. The Court also requests further briefing from BMO or a hearing before awarding attorneys' fees and costs.

So ordered this 13th day of February, 2023.

Kristine G. Baker
United States District Judge